**Pursuant to Ind.Appellate Rule 65(D),this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**WILLIAM H. TOBIN**
South Holland, Illinois

ATTORNEY FOR APPELLEE:

**WILLIAM H. WALDEN**
Munster, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| ELIAS TERRAZAS, )<br>)<br>Appellant-Plaintiff, )<br>)<br>vs. )<br>)<br>ALFONSO MENCHACA, )<br>)<br>Appellee-Defendant. ) | No. 45A03-1309-PL-0382 |

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable John M. Sedia, Judge
Cause No. 45D01-1101-PL-0006

**August 22, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

Elias Terrazas and Alfonso Menchaca invested in the construction of a residence and entered into an oral agreement for payment of expenses incurred in maintaining the residence. Terrazas refused to pay the expenses and a lawsuit ensued. The Lake Superior Court entered judgment in favor of Menchaca. Terrazas appeals, presenting two issues for review. Menchaca presents one issue upon cross-appeal, which we will designate as Issue 2 below. Those issues, restated, are:

1. Did the trial court err in determining that the parties' oral agreement is enforceable?

2. Did the trial court err in essentially awarding to Terrazas one-half of the amount Menchaca collected in rent after June 1, 2010?

3. Did the trial court err in denying Terrazas's request for attorneys' fees?

We affirm in part, reverse in part, and remand.

Terrazas and homebuilder Dale Jansma periodically entered into arrangements whereby Terrazas would loan money to Jansma at a high rate of interest to finance homes Jansma built on speculation. In 2007, Terrazas loaned Jansma money to partially finance construction of a home Jansma was building on Cirque Court in Crown Point, Indiana (the Home). Eventually, Jansma owed Terrazas approximately $160,000 in conjunction with that project. Jansma promised to repay Terrazas when the Home sold.

During construction of the Home, the real estate market began to collapse. In the face of worsening prospects for a quick sale, Jansma needed additional funds to complete

2

construction. Terrazas approached Menchaca, a friend, and asked him to loan $100,000 to Jansma, in return for which Jansma would agree to pay Menchaca 10% interest.

All the while, real estate prices continued to drop and Jansma still owed significant sums to subcontractors on the Home. Because selling the Home for a substantial profit did not seem likely and faced with losing the home to Jansma's creditors, Jansma, Terrazas, and Menchaca tentatively agreed that Menchaca would obtain a mortgage for purchase of the home in the amount of $550,000. Menchaca was the only one of the three who had the financial wherewithal to obtain a mortgage.

Closing on the Home occurred on May 8, 2008. From the proceeds of the sale, all subcontractors' liens were paid, Terrazas was paid $64,548.40 for a prior loan he had made to Jansma plus an additional $25,000, and Menchaca was paid $75,000. Menchaca agreed to take title to the Home until it could be sold. The day before closing, Jansma and Menchaca executed an addendum (the Addendum) to the real estate purchase agreement in which Jansma agreed to make the mortgage payments for the Home. The parties agreed to list the Home for $895,000, but if no offers were made within ninety days, the list price of the Home would be lowered to $750,000. They further agreed that if the Home remained unsold by June 1, 2010, Jansma would forfeit "his rights to any money over $550,000" and Menchaca would be "free to sell to recover his initial loan." *Appellant's Appendix* at 62. The Addendum also provided that all "real estate taxes, Conservancy District tax, insurance premiums, utilities and any costs associated with owning the property to be the sole responsibility of Dale Jansma." *Id.* Finally, the

3

Addendum explained that the intent of the parties was to transfer ownership of the home to Menchaca "for the sole purpose of securing everyone's security, not to claim home as their own." *Id.* at 63.

On the date of closing, Terrazas, Jansma, and Menchaca executed a promissory note that was secured by the Home. The note provided that Terrazas would be paid $75,000 plus 10% interest no later than June 1, 2010. The note also provided that "[u]pon default [Terrazas's] shall be entitled to recover all costs of collection including but not limited to reasonable attorney's fees." *Id.* at 60.

Approximately three months after the closing, Jansma stopped paying the mortgage and maintenance costs on the Home. Therefore, Menchaca was required to pay those sums in their entirety in order to protect his credit rating. He immediately reminded Terrazas of his (Terrazas's) promise to split the costs associated with the Home in the event that Jansma defaulted on his obligations. Terrazas gave $5000 to Menchaca but refused thereafter to pay any additional maintenance costs.

On January 14, 2011, Terrazas filed a complaint against Menchaca seeking repayment of $75,000 owed to him under the promissory note. In Count II, Terrazas sought repayment of the $5000 he claimed he loaned, not gave, to Menchaca for maintenance on the Home.

Terrazas filed a motion for partial summary judgment on Count I of his complaint, which the trial court granted. The trial court entered judgment against Menchaca in the amount of $105,008.03, plus interest of $20.55 per day. Menchaca appealed that

4

judgment and this court affirmed. *See Menchaca v. Terrazas*, No.45A03-1109-PL-415 (Ind. Ct. App. June 4, 2012).

On October 5, 2011, Menchaca filed a counterclaim against Terrazas claiming that Terrazas had breached the parties' oral agreement to divide the expenses of maintaining the Home after Jansma defaulted. Terrazas denied making such a promise and asserted as affirmative defenses the Statute of Frauds and lack of consideration.

On July 8, 2013, a bench trial was held on Count II of Terrazas's complaint against Menchaca and on Menchaca's counterclaim. Afterward, the trial court issued the following pertinent findings of fact and conclusions of law:

> 7. Terrazas contends that Menchaca alone, as owner of the [Home], became responsible for its maintenance costs. When requested by Menchaca, he loaned $5000 to him to help defray the maintenance costs….
>
> 8. Menchaca, on the other hand, contends that as soon as Jansma stopped paying the maintenance costs, he and Terrazas orally agreed that they would equally divide the expenses in maintaining the [Home]. He further contends that this oral agreement was evidenced by Terrazas paying him $5000, which was to be the first of many payments made until the [Home] could be sold….
>
> 9. Where there is no express contract, the right to recover may rest upon an implied contract or an implied promise to pay. Such a contract may be inferred from the conduct, situation, or material relations of the parties and enforced by law. … The intention to pay and the expectation of compensation may be inferred from the conduct of the parties and where equity, justice, and fair dealing require compensation.
>
> 10. Here, Terrazas, Menchaca, and Jansma entered into a written contract, the Addendum, which stated by its own terms, in paragraph 16, that:

5

Alfonso Menchaca and Elias Terrazas are fully aware this transfer of ownership is for the sole purpose of securing everyone's security, not to claim home as their own. The purpose is to let Dale Jansma finish home [sic] and get paid.

The Addendum also specifically provided, in paragraph 7, that Jansma would pay the mortgage payment to Menchaca fifteen days prior to its due date; in paragraph 12, that Jansma would pay and be solely responsible for all real estate, conservancy district tax, insurance premiums, utilities and any costs associated with owning the [Home].

11.      Jansma breached the Addendum and failed to follow these terms. In order to effectuate the purpose of paragraph 16 of the Addendum of "… Securing everyone's security …", including Terrazas's $75,000 Note, the costs and expenses of maintaining the [Home] had to be paid. Given the "… conduct, situation, or material relations …," of Terrazas and Menchaca, as evidenced by the Addendum, and by Terrazas's payment to Menchaca, it is not unreasonable to infer that an agreement existed between the two to pay the expenses of maintaining the [Home] and that Terrazas's payment of $5000 was not a loan to Menchaca, but a contribution to Terrazas's share of the expenses.

*Id.* at 17-18 (internal citations omitted).

After concluding that Terrazas breached the oral agreement to pay half of the expenses of the Home, the trial court determined that Terrazas owed $9500 for the cost of maintaining the Home. Finally, the trial court determined:

The nature of the dispute between Terrazas and Menchaca is unrelated to the costs of collection incurred by Terrazas to enforce Menchaca's obligation under the Note. All attorney fees, including appellate attorney fees, incurred by Terrazas as costs of collection under the Note have been paid in full by virtue of the judgment entered on that Note as affirmed by the Court of Appeals.

*Id.* at 18. Terrazas filed a motion to correct error, which the trial court denied.

1.

The trial court concluded that the oral agreement between Terrazas and Menchaca was enforceable, notwithstanding the Statute of Frauds writing requirement for agreements to answer for the debt of another. In rendering judgment, the trial court entered findings of fact and conclusions of law pursuant to Rule 52(A) of the Indiana Rules of Trial Procedure. Our standard of review applicable in these circumstances is well settled.

> In reviewing findings made pursuant to Rule 52, we first determine whether the evidence supports the findings and then whether findings support the judgment. On appeal we "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A). A judgment is clearly erroneous when there is no evidence supporting the findings or the findings fail to support the judgment. A judgment is also clearly erroneous when the trial court applies the wrong legal standard to properly found facts.

*In re I.E.*, 997 N.E.2d 358, 361 (Ind. Ct. App. 2013), *trans. denied,* (quoting *K.I. ex rel. J.I v. J.H.,* 903 N.E.2d 453, 457 (Ind. 2009) (internal citations omitted)).

The trial court found in Menchaca's favor on his counterclaim against Terrazas for half the cost of maintaining the home after Jansma's default on the basis that the oral agreement between Terrazas and Menchaca to split the maintenance costs was enforceable. Terrazas contends upon appeal that the oral agreement was unenforceable because there was no consideration given for Terrazas's promise to pay and because the oral contract constituted an unwritten agreement to answer for the debt of another in violation of the Statute of Frauds.

7

We begin with the trial court's finding that "it is not unreasonable to infer that an agreement existed between the two to pay the expenses of maintaining the Cirque Court home and that Terrazas's payment of the $5000 was not a loan to Menchaca, but a contribution to Terrazas's share of the expenses." *Appellant's Appendix* at 18. The parties' trial testimonies sharply disagreed as to whether there was such an agreement. Menchaca testified that prior to executing the mortgage and Addendum, he told Terrazas he was concerned about what would happen if Jansma defaulted on his obligations. At that point, according to Menchaca, he told Terrazas he was not inclined to go through with the arrangement. Menchaca testified that Terrazas "told me not to worry about it. He says, listen. I'm going to make you a promise. If you take the house and put it in your name, we all get paid some money. And if Jansma ever defaults on the payments, I will help you." *Transcript* at 52. Menchaca testified that he interpreted this to mean that Terrazas would help Menchaca "pay the expenses of the mortgage as well as the insurance and the expenses that came out of the house." *Id*. at 53. Based upon Terrazas's assurance that he would contribute if Jansma defaulted, Menchaca agreed to take out a mortgage on the Home. He stated unequivocally at trial: "I would not have purchased the house if [Terrazas's] hadn't agreed to help me." *Id.*

For his part, Terrazas emphatically denied he made the oral promise upon which Menchaca's claim is premised. When asked whether he had agreed with Menchaca to share expenses in the event of Jansma's default, Terrazas replied: "Never, never. He never asked me to do that. And if he would have asked me to do that, I would not have

8

agreed to because there was no way I would have been able to pay for the expenses." *Id.* at 137.

Obviously, the testimonies of Terrazas and Menchaca were irreconcilable on the question of whether Terrazas agreed to contribute as Menchaca claims he did. The trial court chose to believe Menchaca and there was evidence to support that finding. Therefore, pursuant to our standard of review, we must accept the trial court's finding that Terrazas did indeed orally agree to share costs associated with the Home in the event Jansma defaulted. The question now is, when was that agreement reached? In Finding No. 8, the trial court stated "Menchaca, on the other hand, contends that as soon as Jansma stopped paying the maintenance costs, he and Terrazas orally agreed that they would equally divide the expenses in maintaining the Cirque Court home." *Id.* at 17. We find no evidence in the record to support this finding with respect to the timing of the agreement.

As recounted above, Terrazas flatly denied that he had ever made such a promise. Menchaca, on the other hand, claimed Terrazas had assured him that he would split the costs associated with the home in the event Jansma defaulted. Menchaca testified that this agreement was reached *before* Menchaca signed the mortgage and Addendum. In other words, Menchaca claimed that the agreement was reached several months before Jansma defaulted. We note in this regard Menchaca's previously discussed testimony that he ultimately decided to enter into the venture only because Terrazas had assured him he would split the costs; this is what Menchaca claimed induced him to take out the

9

mortgage in the first place. Moreover, Menchaca testified that when he contacted Terrazas *after* Jansma defaulted:

A    I asked him *and reminded him of our agreement*, and I told him that I needed to get some money right now because there was more mortgage payments coming.

Q    This is the agreement that you testified to earlier?"

A    Correct.

Q    That you each *were going to share the expenses in the event that Mr. Jansma defaulted*?

A    Correct.

*Id.* at 67 (emphasis supplied). The foregoing indicates that if Terrazas orally agreed to split the costs incurred as a result of Jansma's default – and the trial court found that he did – this agreement was reached before Menchaca took out the mortgage and therefore certainly before Jansma defaulted.

The dissent points to language in the record ostensibly tending to show that the agreement was reached after Jansma defaulted. For instance, Menchaca submitted an affidavit stating: "Terrazas and I had a conversation about this after Jansma ceased to pay expenses, and we agreed at that point to divide equally the cost of meeting the mortgage payments and other expenses of maintaining the home." *Exhibit Binder* at Exhibit 6, paragraph 5. In another affidavit, Menchaca stated, "Jansma defaulted on his obligation to pay the costs and expenses associated with the real estate and Terrazas and I agreed to divide equally those expenses." *Id.* at Exhibit 7, paragraph 5. These statements certainly

10

do not demonstrate that an agreement was reached before Jansma's default, but neither do they belie that claim. In fact, Menchaca was vigorously questioned on this point on cross-examination:

> Q     You didn't say: Oh, no, we made this agreement back in February or March 2008. You said you made it because of the failure of Jansma to pay those expenses?
>
> A     I failed to mention to him that we had an agreement since before I even bought the house, and I don't think these are inaccurate statements that I'm saying here [referring to the aforementioned statements set out in the affidavits]. I'm not saying I never told him before, that now I have.

*Transcript* at 111. Menchaca was then asked rhetorically "[b]oth of them can't be true, right?" *Id.* at 111-112. "Them" in this context referred to, on one hand, his trial testimony that an agreement was in place before the mortgage was signed, and on the other, the foregoing statements in the affidavits. Menchaca responded that he did not think they were inconsistent. He explained that he did not believe it was important for him to indicate when completing the affidavits that the agreement in question dated back to a time before Jansma's default. Rather, the import of the affidavits in this regard was to identify Jansma's default as the event that triggered Terrazas's obligation under the oral promise. This strikes us as reasonable. The point is that Menchaca consistently and adamantly maintained at trial that the agreement was reached prior to his procuring a mortgage on the property and that was in fact ultimately what induced him to enter into the arrangement in the first place. The statements in question may not support Menchaca's claim as to the timing of the promise, but neither do they contradict it. They

11

are neutral. They certainly are not of such a character as to counterbalance Menchaca's persistent and unequivocal trial testimony regarding when the promise was made.

In summary, we can find no evidence supporting the trial court's finding that the agreement was reached after Jansma defaulted. Instead, the only evidence supporting the existence of an agreement revealed that it was reached prior to Menchaca's commitment to the venture. Therefore, we proceed on the assumption that Terrazas's promise to pay was made prior to Menchaca's signing of the mortgage and the execution of the Addendum.[1]

We will begin with Terrazas's argument that his promise is unenforceable because it lacked consideration. Consideration is a required element of a valid contract. *Jackson v. Luellen Farms, Inc.*, 877 N.E.2d 848 (Ind. Ct. App. 2007). It is defined as "[s]omething of value (such as an act, a forbearance, or a return promise) received by a promisor from a promise." *Id. at* 857 (quoting Black's Law Dictionary 300 (7th

---

[1] In his reply brief, Terrazas claims that the doctrine of merger "requires the conclusion that there was no such oral agreement predating the parties' agreements on May 8, 2008." *Reply Brief* at 9. Pursuant to that doctrine, "[I]n the absence of fraud or mistake, all prior or contemporaneous negotiations or executory agreements, written or oral, leading up to the execution of the deed are merged therein by the grantee's acceptance of the conveyance and performance thereof." *Williams v. Younginer*, 851 N.E.2d 351, 356 (Ind. Ct. App. 2006) (quoting *Thompson v. Reising*, 114 Ind. App. 456, 462, 51 N.E.2d 488, 491 (1943)). We note, however, that there is an exception to that doctrine applicable in the present case. The doctrine of merger does not apply "where the contract creates rights 'collateral to and independent of the conveyance.'" *Id.* at 356-57 (quoting *Thompson v. Reising*, 114 Ind. App. at 463, 51 N.E.2d at 488). Such collateral rights are described as "rights not having to do with the title, possession, quality, or emblements of the land conveyed." *Id.* at 357. The exception exists because "[c]ollateral and independent rights or obligations are permitted to survive the deed because their performances are not necessary to the conveyance of the real estate; thus, there is no need to merge them into the contract." *Id.* So it is in the present case. Terrazas's oral promise to pay half of the expenses associated with the home in the event of Jansma's default are unrelated to the title, possession, quality, or emblements of the land conveyed. Therefore, the doctrine of merger does not apply.

ed.1999)). Valid consideration consists of either a benefit accruing to the promisor or a detriment to the promisee. *Indiana Dep't of State Revenue v. Belterra Resort Indiana, LLC*, 935 N.E.2d 174 (Ind. 2010), *modified on reh'g*, 942 N.E.2d 796 (2011).

Menchaca testified that he agreed to take out the mortgage only after Terrazas assured Menchaca that he would split the costs with Menchaca if Jansma defaulted. Menchaca insisted that he "would not have purchased the house if [Terrazas] hadn't agreed to help me." *Transcript* at 53. Terrazas vigorously denied ever agreeing to share expenses with Menchaca. Instead, he claimed that he loaned $5000 to Menchaca after Jansma's default "because of friendship, not for any other reason." *Id.* at 138. Terrazas's argument concerning the lack of consideration is premised partially upon the view that his "supposed" promise to split costs with Menchaca occurred when Menchaca came to him for help after Jansma defaulted. *Appellant's Brief* at 16. Of course, this would have been well after the May 8, 2008 signing of the promissory note whereby Menchaca obligated himself to pay Jansma's debt to Terrazas in the event that Jansma defaulted. Accordingly, Terrazas argues that his "supposed" promise "was not supported by any additional or new benefit to" Terrazas. *Appellant's Brief* at 18-19. That is, Terrazas contends that he was entitled to enforce the note against Menchaca "in any event." *Id.* at 19.

The evidence of record establishes that if, as the trial court found, Terrazas did in fact orally promise to split costs with Menchaca, that promise was made *before* May 7, 2008, i.e., before Menchaca signed the mortgage and Addendum. The only reasonable

13

inference to be drawn from Menchaca's testimony is that Menchaca was induced to sign the promissory note on May 7, as well as the Addendum on May 8, on the strength of Terrazas's oral promise. Therefore, the only evidence supporting the existence of a promise on Terrazas's part compels the conclusion that at the time Terrazas made it, Menchaca was not then obligated to pay the $75,000 promissory note, nor was he even obligated to enter into the venture in the first place. Terrazas benefited from his promise to Menchaca in that Terrazas's investment in the Home at that point was protected from a foreclosure action that would probably have ensued had Menchaca not entered the venture. This benefit to Terrazas was sufficient consideration to support the promise.

We turn now to the claim that the oral promise was unenforceable pursuant to the Statute of Frauds. "The Statute of Frauds provides that no action shall be brought to charge any person upon a promise to answer for the debt of another unless that promise is in writing." *Tolliver v. Mathas*, 538 N.E.2d 971, 976 (Ind. Ct. App. 1989); *see* Ind. Code Ann. § 32-21-1-1(b)(2) (West, Westlaw current with all legislation of the Second Regular Session of the 118th General Assembly (2014) with effective dates through May 1, 2014). The present situation involves such a promise and therefore the Statute of Frauds applies. Further, it is true, as the dissent notes, that the purpose of the Statute of Frauds is to prevent fraudulent claims that might well arise when a dispute turns upon one party's word against the other's, and that this dispute boils down to Menchaca's word against Terrazas's. *See Coca-Cola Co. v. Babyback's Int'l, Inc.*, 841 N.E.2d 557 (Ind. 2006). This does not settle the matter, however. There are exceptions to the Statute of Frauds

14

and those exceptions, by definition, apply only in cases where the Statute of Frauds would ordinarily foreclose an action based upon the oral promise in question, regardless of whether the parties agree that the promise was ever made in the first place. Menchaca contends that one such exception is applicable here, i.e., the doctrine of part performance. This exception represents an impingement upon the express provisions of the Statute of Frauds, applies. *See Coca-Cola Co. v. Babyback's Intern., Inc.*, 841 N.E.2d 557 (Ind. 2006). Pursuant to the doctrine of part performance, "equity will not permit a party who breaches an oral contract to invoke the statute of frauds where the other party 'has performed his part of the agreement to such an extent that repudiation of the contract would lead to an unjust or fraudulent result[.]'" *Spring Hill Developers, Inc. v. Arthur*, 879 N.E.2d 1095, 1104 (Ind. Ct. App. 2008) (quoting *Summerlot v. Summerlot,* 408 N.E.2d 820, 828 (Ind. Ct. App. 1980)).

Menchaca testified that he was having grave doubts about joining the venture, and in fact had decided that because of his concern about Jansma's ability to make the mortgage payments, he (Menchaca) would not take out a mortgage on the Home. At that point, it appeared that the plan was not going to be implemented. When he communicated this to Terrazas, Terrazas told Menchaca not to worry and promised to "help" Menchaca with expenses associated with the Home in the event that Jansma defaulted. *Transcript* at 52. Relying on this promise, Menchaca changed his mind, obtained the mortgage, and signed the Addendum. To the extent Terrazas's promise

15

constituted a guaranty of Jansma's performance, Menchaca's performance under the oral contract removed it from the requirements of the Statute of Frauds.

We note the view of our colleague in dissent that the elements of part performance have not been met because, among other things, "Menchaca could not have relied on Terrazas's *later* promise to pay half of the expenses when Menchaca obligated himself to pay the costs of maintaining the home" Slip op at (30) (emphasis supplied). As set out above, the only evidence in the record pertaining to the timing of the promise indicates that it was made before Menchaca took out the mortgage and signed the Addendum. In other words, Terrazas's promise is what induced Menchaca to obtain the mortgage in the first place. It did not come later. Be that as it may, even assuming for the sake of argument that the doctrine of part performance is not applicable here, the trial court's judgment is sustainable on other grounds.

Both parties requested findings of fact and conclusions of law pursuant to T.R. 52(A). "[W]here a trial court has made special findings pursuant to a party's request under Trial Rule 52(A), the reviewing court may affirm the judgment on any legal theory supported by the findings." *Mitchell v. Mitchell*, 695 N.E.2d 920, 923-24 (Ind. 1998). Before affirming on a legal theory supported by the findings but not espoused by the trial court, however, we must be confident that its affirmance is consistent with all of the trial court's findings of fact and inferences drawn therefrom. *Daugherty v. Daugherty*, 816 N.E.2d 1180 (Ind. Ct. App. 2004). We believe the trial court's judgment is supportable under the theory of estoppel. As applied here, that doctrine is as follows:

> The doctrine of estoppel to assert the statute of frauds against a claim based upon an oral contract is founded upon the vital principle that 'he who by his language or conduct leads another to do, upon the faith of an oral agreement, what he would not otherwise have done, and changes his position to his prejudice, will not be allowed to subject such a person to loss or injury, or to avail himself of that change to the prejudice of such other party.' 49 Am.Jur., Statute of Frauds s 583, page 890.

*Dupont Feedmill Corp. v. Standard Supply Corp.*, 182 Ind. App. 459, 463, 395 N.E.2d 808, 811 (1979) (quoting *Hurd v. Ball*, 128 Ind. App. 278, 295, 143 N.E.2d 458, 466 (1957)).

In deciding whether this doctrine applies, we find it significant that Terrazas actively solicited Menchaca's involvement. It is apparent that our view on this point is not shared by the dissent, which states that "Terrazas introduced Menchaca to and encouraged him to enter into the real estate venture with Jansma." Slip op. at 30. We think this understates Terrazas's role in Menchaca becoming involved. In fact, the venture began as one between Terrazas and Jansma only, and at some point was in danger of failing. At that critical juncture, Terrazas contacted Menchaca and asked him to join because Terrazas and Jansma did not have the resources to go forward. Essentially, Menchaca was asked to step in and save the venture. Whether Menchaca is or is not a wealthy businessman is beside the point. The fact is that he was the only one of the three men who had the financial wherewithal to obtain funding so that the project could go forward, and Jansma and Terrazas – and yes, if he entered, Menchaca – could recoup their investments. Menchaca did not decide to invest in the speculative real estate

17

venture despite reservations about Jansma until Terrazas promised to share the risk in the event of Jansma's default.

We have detailed at length that the testimonies of Terrazas and Menchaca were irreconcilable on the question of whether Terrazas agreed to contribute as Menchaca claimed he did. The trial court chose to believe Menchaca. Therefore, pursuant to our standard of review, we must accept the trial court's finding that Terrazas did indeed orally agree to share costs associated with the Home in the event that Jansma defaulted. Accepting this finding as true, Menchaca's testimony indicates that he agreed to enter the venture and obtain a mortgage in his own name only because Terrazas assured him he would split the costs in the event that Jansma defaulted. Thus, on the strength of Terrazas's oral promise, Menchaca changed his mind and entered into the agreement, which ultimately redounded to Menchaca's prejudice when Jansma defaulted. On these facts, Terrazas is estopped from citing the writing requirement of the Statute of Frauds as a means of avoiding his oral promise to Menchaca.

2.

The trial court concluded that Terrazas was liable for half of the expenses associated with the Home after Jansma defaulted on his obligations. The court calculated those expenses to be $125,000. Rather than render judgment in favor of Menchaca for that amount, however, the trial court concluded that Terrazas was entitled to set off half the amount Menchaca collected in rent after June 1, 2010. On cross-appeal, Menchaca contends the trial court erred in crediting Terrazas with half of the rent.

18

The financial arrangement between the parties was governed by the Addendum. By way of review, the Addendum provided, in pertinent part as follows: 1) From the mortgage proceeds, Terrazas was entitled to $64,592.24 and Menchaca was entitled to $3534.60 from the payment for the home; 2) the mortgage secured a $75,000 note held by Terrazas against the Home, plus accruing interest on promissory notes executed between Jansma and Terrazas; 3) the mortgage secured a $25,000 note held by Menchaca against the Home, plus interest accruing on promissory notes executed between Jansma and Menchaca; 4) if the property sold after June 1, 2010, Menchaca was entitled to keep all of the proceeds after the other specified obligations were met. Thus, the Addendum established June 1, 2010 as a pivotal date. If the home sold before then, Jansma would "keep all profits above the loan payoff from Countrywide home loans, and [Menchaca] and [Terrazas's] principal and interest." *Id.* at 63. Menchaca also testified that if the home sold before June 1, 2010, he and Terrazas would split the profit. On the other hand, the Addendum provided, "if the property sells after the June 1, 2010 deadline, [Menchaca] may keep all proceeds over the initial loan." *Appellant's Appendix* at 62.

The Home did not sell by June 1, 2010. In fact, after the house had been on the market but did not sell, Menchaca found a tenant who rented the Home and whose lease commenced on or after that date, i.e., June 1, 2010. We can find no basis in the Addendum for a conclusion that Terrazas had a legal interest in rent proceeds from the Home after the June 1, 2010 deadline. Per the Addendum, Terrazas's only financial interest in the home after June 1, 2010, was the right to receive $64,592.24, plus the

19

$75,000 note he held against the Home, plus interest on the promissory notes between him and Jansma.

Terrazas claims that to award all of the rent proceeds to Menchaca would be "to adopt an illogical scheme whereby all expenses are to be shared by Menchaca and Terrazas equally but all income generated while those expenses were occurring are to be kept by Menchaca alone." *Reply Brief* at 18. Yet, this is precisely what would have happened had there been any profit realized (over the amount of Menchaca's investment) if the home had sold after June 1, 2010 – i.e., Menchaca would have retained all of it, notwithstanding that Terrazas would have been liable for paying expenses after June 1, 2010 until the home sold. In fact, Terrazas himself concedes that "[n]othing in the addendum or any other document gives Terrazas any expectation of profit or other rights *except to recover the principal of his promissory note and accrued interest*." *Appellant's Brief* at 16 (internal citations omitted) (emphasis supplied). The Addendum simply makes no provision for recovering anything but principal and interest with respect to his promissory note, and certainly provides no basis for a right to reimbursement for expenses paid after June 1, 2010. Inasmuch as the $96,000 collected in rent was all post-June 1, 2010, the trial court erred in crediting Terrazas with a one-half interest in the total and reducing the judgment against him by that amount.

3.

Finally, Terrazas contends the trial court erred in failing to grant his request for attorneys' fees, which was based upon his claim that he is entitled to all costs of

collection, including attorneys' fees. Generally, in Indiana a party must pay its own attorneys' fees absent an agreement between the parties, a statute, or other rule to the contrary. *R.L. Turner Corp. v. Town of Brownsburg*, 963 N.E.2d 453 (Ind. 2012). We review the denial of a request for attorneys' fees for an abuse of discretion. *Wyatt v. Wheeler*, 936 N.E.2d 232 (Ind. Ct. App. 2010).

Terrazas, Jansma, and Menchaca executed a promissory note, which was secured by the Home. The note provided that Terrazas would be paid $75,000 plus 10% interest no later than June 1, 2010. It also provided that "upon default [Terrazas] shall be entitled to recover all costs of collection including but not limited to reasonable attorney's fees." *Appellant's Appendix* at 60. After Menchaca and Jansma defaulted under the terms of the note, Terrazas filed a lawsuit and obtained judgment against Menchaca in the amount of $102,335.03 plus interest and attorneys' fees as provided for in the promissory note.

Menchaca's counterclaim did not arise under the promissory note, but rather from the oral agreement between him and Terrazas that the two would split costs incurred in the event of Jansma's default. On this point, the trial court found as follows:

> The nature of the dispute between Terrazas and Menchaca is unrelated to the costs of collection incurred by Terrazas to enforce Menchaca's obligation under the Note. All attorney fees, including appellate attorney fees, incurred by Terrazas as costs of collection under the Note have been paid in full by virtue of the judgment entered on that Note as affirmed by the Court of Appeals.

21

*Id.* at 18. Terrazas contends his "defense of Menchaca's counterclaim is so intimately connected to his attempts to collect his judgment on the promissory note that he is entitled to attorney's fees incurred in that defense." *Reply Brief* at 4.

After the trial court entered judgment against Menchaca in the amount of $105,008.03 plus interest, Menchaca deposited $123,000 with the trial court in lieu of an appeal bond, which represented the promissory note judgment plus anticipated interest and attorneys' fees. After the judgment was a affirmed on appeal, Menchaca moved to attach the funds pursuant to Ind. Code Ann. § 34-25-2-1 (West, Westlaw current with all legislation of the Second Regular Session of the 118th General Assembly (2014) with effective dates through May 1, 2014) to secure payment if he prevailed on his counterclaim. The trial court ordered the clerk to release $14,951.47 to Terrazas's attorney for payment of attorneys' fees and approximately $11,048.53 to Terrazas in partial satisfaction of the judgment. The clerk was directed to "attach and continue to hold on deposit the sum of $97,000 to secure any judgment entered in favor of counter-plaintiff on the counterclaim herein." *Appellant's Appendix* at 58. After entering judgment in favor of Menchaca on his counterclaim, the trial court directed the trial court clerk "to release the funds currently on deposit … as follows: $9500 to the defendant, Alfonso Menchaca, and the balance to plaintiff, Elias Terrazas." *Id.* at 19.

Menchaca effectively secured the judgment awarded to Terrazas on Count I of his complaint when he deposited $123,000 with the trial court clerk. The funds were held by the clerk with the understanding that the balance of such funds would be released to

22

Terrazas and/or his attorney after judgment was rendered on Menchaca's counterclaim. Terrazas's claim for breach of the promissory note is factually distinct from Menchaca's claim for reimbursement of costs to maintain the Home, which arises from separate parole dealings between the parties.[2] Accordingly, we are not persuaded by Terrazas's argument that defending against Menchaca's counterclaim should be considered a cost of collection under the terms of the promissory note. *See, e.g., West Cent. Conservancy Dist. v. Burdett* 920 N.E.2d 699, 703-04 (concluding that the issues involved in the appellant's action to collect unpaid sewer fees from the appellee and those involved in the appellee's action against the appellant concerning the location of its utility lines "were sufficiently distinct for the trial court to exercise its discretion to award only those attorney fees incurred in connection with West Central's action for the delinquent fees"). We therefore affirm the trial court's denial of Terrazas's request for attorneys' fees incurred defending against Menchaca's counterclaim.

Finally, Terrazas contends his judgment has not been paid in full. It does appear from the record that Terrazas has not been paid post-judgment interest on the

---

[2] Terrazas cites multiple cases in which this court affirmed an award of contractually or statutorily authorized attorneys' fees for the defense of counterclaims because the defense in question was inextricably interwoven with the issues raised in the plaintiff's complaint. *See, e.g., Abbey Villas Developmental Corp. v. Site Contractors, Inc.*, 716 N.E.2d 91, 103 (Ind. Ct. App. 1999) (concluding that "Contractor's defense against [Developer's counterclaims] was part and parcel of, and necessary to, the enforcement of its mechanic's lien. Therefore we cannot conclude that the trial court erred by awarding the attorney fees Contractor incurred defending against Developers counterclaims"), *trans. denied*; *Motor Dispatch, Inc. v. Buggie*, 177 Ind. App. 347, 352, 379 N.E.2d 543, 546 (Ind. Ct. App. 1987) (stating, "it would be useless to provide attorney fees for collection on a defaulted note if time spent defending fatuous set-off claims were not also recompensable"). We reiterate that Terrazas's judgment on the promissory note is separate and distinct from Menchaca's counterclaim, through which Menchaca sought to enforce Terrazas's oral promise to pay half of the expenses for maintaining the Home in the event of Jansma's default.

$105,008.03 judgment rendered in his favor on August 25, 2011. Accordingly, we remand this case to the trial court for calculation of post-judgment interest owed to Terrazas pursuant to Ind. Code Ann. § 24-4.6-1-101 (West, Westlaw current with all legislation of the Second Regular Session of the 118th General Assembly (2014) with effective dates through May 1, 2014).

In summary, we affirm the judgment in favor of Menchaca on his counterclaim and affirm as well the denial of Terrazas's request for attorneys' fees. We reverse the trial court's determination that Terrazas was entitled to set off half of the rent collected after June 1, 2010 against the money judgment in favor of Menchaca. We remand to the trial court with instructions to correct the amount of judgment in favor of Menchaca without the setoff. Finally, we remand the trial court to calculate post-judgment interest owed to Terrazas pursuant to the August 25, 2011 judgment and enter judgment accordingly.

Judgment affirmed in part, reversed in part, and remanded with instructions.

PYLE, J., concurs.

MATHIAS, J., dissents.

24

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ELIAS TERRAZAS, | ) | |
| | ) | |
| Appellant-Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 45A03-1309-PL-0382 |
| | ) | |
| ALFONSO MENCHACA, | ) | |
| | ) | |
| Appellee-Defendant. | ) | |

**MATHIAS, Judge, dissenting**

I respectfully dissent from the majority's conclusion that the agreement between Menchaca and Terrazas is enforceable. I also disagree with the majority's conclusion that Terrazas should not receive a credit in the amount of half of the rental income Menchaca received.

First, I observe that the evidence supports the trial court's finding that Menchaca and Terrazas agreed that Terrazas would pay a share of the expenses of maintaining the home after Jansma defaulted on his agreement to do so. However, contrary to the majority's conclusion, I find that the evidence strongly supports the trial court's finding that the parties' agreement was not reached until after Jansma's default.

25

Menchaca's own statements concerning the timing of his agreement with Terrazas to share the expense of maintaining the home are conflicting. Menchaca agreed to purchase the home only after Jansma agreed to pay the mortgage on the property. Menchaca was understandably concerned that Jansma might default. Menchaca testified that Terrazas told him that if Menchaca purchased the home "we all get paid some money, and if Jansma ever defaults on the payments, I will help you." Tr. p. 52.

After Jansma defaulted, Menchaca stated that he met with Terrazas and "reminded him of" their agreement to share expenses. Tr. p. 67. Terrazas then gave Menchaca a check in the amount of $5,000 to "cover three months" of payments, and stated that he would meet with Menchaca in three months to figure out "how much more" Terrazas would "have to give" Menchaca. Tr. p. 67.

However, Menchaca also averred that *after* Jansma defaulted, he and Terrazas "agreed at that point to divide equally the cost of meeting the mortgage payments and other expenses of maintaining the home." Ex. Vol., Plaintiff's Ex. 6; Tr. pp. 107-08. In his counterclaim, Menchaca likewise alleged that "*after* the default by Jansma, Menchaca and Terrazas agreed to divide equally the mortgage payment and other expenses of the home." Appellant's App. p. 32 (emphasis added); Tr. p. 112.

We are not to reweigh the evidence on appeal. Marion County Auditor v. Sawmill Creek, LLC, 964 N.E.2d 213, 216 (Ind. 2012). The trial court weighed the evidence and, in finding number 8, determined that Menchaca and Terrazas reached the agreement to equally share the expenses of maintaining the home only *after* Jansma defaulted.

26

Accordingly, I disagree with the majority's conclusion that there is no evidence in the record to support finding number 8. See Slip op. at 9.

I also agree with Terrazas's argument that any alleged agreement as to expense-sharing in the event of Jansma's default is unenforceable under the Statute of Frauds. To be enforceable, a contract to assume liability for another's debts must be in writing and signed by the primary debtor. See Ind. Code § 32-21-1-1(b)(2). Specifically, Indiana Code section 32-21-1-1(b)(2) provides:

> A person may not bring any of the following actions unless the promise, contract, or agreement on which the action is based, or a memorandum or note describing the promise, contract, or agreement on which the action is based, is in writing and signed by the party against whom the action is brought or by the party's authorized agent: . . . (2) An action charging any person, upon any special promise, to answer for the debt, default, or miscarriage of another.

The underlying purpose of the Statute of Frauds is "to preclude fraudulent claims that would likely arise when the word of one person is pitted against the word of another." Coca-Cola Co. v. Babyback's Int'l, Inc., 841 N.E.2d 557, 567 (Ind. 2006) (quoting Brown v. Branch, 758 N.E.2d 48, 51 (Ind. 2001)). It seems to me that this is precisely the situation we are faced with in this appeal.

As the record owner of the Cirque Court home, it is undisputed that Menchaca was, to the mortgagee and all others in the outside world, legally responsible for payment of all costs associated with said ownership. Indeed, the parties sought to maintain this façade under the terms of the May 7, 2008 Addendum, which required Jansma to pay the mortgage to Menchaca fifteen days before the payment was due to the mortgagee, as well

27

as to pay all "real estate taxes, conservancy district tax, insurance premiums, utilities and any costs associated with owning the property[.]" Appellant's App. p. 62. I would therefore conclude that Terrazas's promise to pay half of the maintenance costs for the home fell within the Statute of Frauds as a "promise[] to answer for the debt . . . of another." See I.C. § 32-21-1-1(b)(2).

The majority holds that the doctrine of part performance removes the parties' agreement from the Statute of Frauds. This doctrine "is based on the rationale that equity will not permit a party who breaches an oral contract to invoke the [S]tatute of [F]rauds where the other party 'has performed his part of the agreement to such an extent that repudiation of the contract would lead to an unjust or fraudulent result[.]'"[3] Spring Hill Dev., Inc. v. Arthur, 879 N.E.2d 11104 (Ind. Ct. App. 2008) (citation omitted); see also Tolliver v. Mathas, 538 N.E.2d 971, 976 (Ind. Ct. App. 1989) (stating "where one party to an oral agreement has partially performed in reliance on the contract and it would be perpetrating a fraud upon him to allow the other party to repudiate the contract, equity removes the agreement from the Statute of Frauds and enforces the contract").

Menchaca is a sophisticated businessman who has owned and operated two profitable restaurants for over thirty years. When he was first approached about investing in the Cirque Court home, he declined because he thought that Jansma might not be "able

---

[3] The doctrine of part performance applies to remove certain oral contracts from the Statute of Frauds in actions involving contracts for sale of land and promises to answer for the debt of another. See Coca-Cola Co. v. Babyback's Intern., Inc., 841 N.E.2d 557, 566 (Ind. 2006) (citing Perkins v. Owens, 721 N.E.2d 289, 292 (Ind. Ct. App. 1999); Tolliver v. Mathas, 538 N.E.2d 971, 976 (Ind. Ct. App. 1989). But the doctrine does not apply to contracts that cannot be performed within one year. See id.

to meet [his] obligations to the banks." Tr. p. 46. However, a few months later, Menchaca changed his mind and invested $100,000 of his own funds in the home. Tr. pp. 48, 114-15. When Jansma continued to struggle to pay liens on the property, Menchaca agreed to purchase the home. Tr. pp. 49-50.

Menchaca agreed to purchase the home to protect his own $100,000 investment, and in doing so, protected Terrazas's investment as well. Tr. p. 58. Menchaca also agreed to purchase the home only after Jansma agreed to pay certain expenses for the Cirque Court home after the closing. That agreement was memorialized in the Addendum signed by Jansma, Menchaca and Terrazas. There was no similar, written agreement between Menchaca and Terrazas. After Jansma defaulted on the agreement, and Menchaca asked Terrazas to pay half of the mortgage and other expenses, Terrazas gave Menchaca $5,000, but refused to give him additional funds.

This evidence supports the trial court's finding that on the date of closing, the only agreement concerning payment of the expenses was Menchaca's agreement with Jansma. Moreover, on the date of closing, Terrazas, Jansma, and Menchaca executed a promissory note, which was secured by the Cirque Court home. The note provided that Terrazas would be paid $75,000 plus 10% interest no later than June 1, 2010. When Menchaca purchased the Cirque Court home, Terrazas was not obligated to invest any additional funds in the home, and the parties agreed that Menchaca would be repaid his investment plus 10% interest.

Despite his expressed reservations about Jansma's financial wherewithal, Menchaca entered into a speculative real estate venture with hopes of earning a substantial return on his investment. When his fears about Jansma were realized, Menchaca agreed to purchase the home from Jansma and assume the overall market risk associated with it. Moreover, the underlying mortgage also worked to secure, in Menchaca's name alone, the aggregate indebtedness of all of the parties. Menchaca could not have relied on Terrazas's later promise to pay half of the expenses when Menchaca obligated himself to pay the costs of maintaining the home. Furthermore, Menchaca continued to protect his own, substantial investment in the home by paying the mortgage and expenses after Jansma's default, subsequent to Terrazas's refusal to pay more than $5,000. For all of these reasons, I would conclude that the doctrine of part performance is inapplicable to the circumstances presented here, and therefore, would hold that the agreement is unenforceable under the Statute of Frauds.[4] I would therefore reverse the judgment in Menchaca's favor on his counterclaim.

Because the majority has affirmed the judgment, I also write separately to address the majority's conclusion that Terrazas was not entitled to a set off of half the amount of rent that Menchaca collected after June 1, 2010. Menchaca rented the home for $4,000 a

---

[4] For these same reasons, I disagree with the majority's conclusion that Terrazas "is estopped from citing the writing requirement of the Statute of Frauds as a means of avoiding his oral promise to Menchaca." Slip op. at 15. Terrazas introduced Menchaca to and encouraged him to enter into the real estate venture with Jansma. But Menchaca is a wealthy businessman in his own right and decided to invest in the speculative real estate venture despite his reservations about Jansma. And, as I observed above, I believe the trial court's finding that Terrazas only agreed to equally share the expenses of maintaining the home after Jansma defaulted is supported by the evidence.

month for twenty-four months collecting a total of $96,000, which he used to pay expenses incurred as the owner of the home. At trial, Menchaca testified that Terrazas should get credit for half of the lease payments when calculating Terrazas's share of the expenses of maintaining the home. Tr. pp. 75, 93. And the trial court deducted $96,000 from the total expenses of maintaining the home before calculating the judgment Terrazas owed to Menchaca.

*For the first time on appeal*, Menchaca argues that the rental income should not be deducted from Terrazas's share of the expenses. The majority agrees and utilizes the terms of the Addendum that established who would receive the profit from the sale of the home if it was sold prior to or after June 1, 2010. The majority states that Terrazas is not entitled to credit for one-half of the rent payments because the "Addendum simply makes no provision for reimbursing Terrazas for expenses paid after June 1, 2010." Slip op. at 17.

However, under the terms of the Addendum, only Jansma was required to pay the expenses incurred on the home. There are no terms in the Addendum obligating Terrazas to pay any expenses associated with the home. Therefore, I disagree with the majority's use of the Addendum to conclude that Terrazas should not receive credit for one-half of the rental proceeds in calculating Terrazas's share of the expenses. I would also conclude that Menchaca invited any error on this issue by actually agreeing at trial that Terrazas should get credit for one-half of the lease payments he collected. See Balicki v. Balicki, 837 N.E.2d 532, 541 (Ind. Ct. App. 2005) (observing that "the doctrine of invited error is

31

grounded in estoppel and precludes a party from taking advantage of an error that he or she commits, invites, or which is the natural consequence of his or her own neglect or misconduct"), trans. denied.